Shelley **FEDERICO**, et al., Plaintiffs,

v.

**LINCOLN MILITARY HOUSING,** et al., Defendants.

Civil No. 2:12cv80.

United States District Court, E.D. Virginia, Norfolk Division.

Oct. 18, 2012.

David Sanburg Bailey, Jennifer Alettia French, Tammy L. Belinsky, The Environmental Law Group PLLC, Richmond, VA, Tammy L. Belinsky, The Environmental Law Group PLLC, Copper Hill, VA, Craig Stewart Gill, Jr., Bennett & Zydron, PC, Virginia Beach, VA, Stephen C. Swain, Shuttleworth Ruloff Swain Haddad & Morecock, PC, Virginia Beach, VA, for Plaintiffs.

Connie Nora Bertram, Daniel Jerome Davis Cooley LLP, Brendan Jeremiah Crimmins, David Charles Frederick, Kellogg Huber Hansen Todd Evans & Figel, PLLC, Washington, DC, for Defendants.

### OPINION AND ORDER

ROBERT O. DOUMAR, Senior District Judge.

In the instant action, Plaintiffs Shelley and Joe Federico ("Plaintiffs") seek to sue Defendants Lincoln Military Housing LLC ("LMH"), Mid–Atlantic Military Family Communities LLC ("Mid–Atlantic"), LPC Property Management, Inc. ("LPC") (collectively "Defendants"), and John Doe for alleged personal injury and property damages. Plaintiffs case was removed from state court to this Court, and this matter is currently before the Court on Plaintiffs Motion to Remand to state court pursuant to 28 U.S.C. § 1447. For the reasons set forth below the Court **DENIES** Plaintiffs' Motion to Remand. A general decision requires an analysis of the statutes and case law involved as prerequisite to a ruling.

## I. Factual Background

### A. Complaint—Factual Summary

According to the Complaint filed by the Federicos in the Circuit Court for the City

of Norfolk, Plaintiffs are husband and wife who lived in military housing located in Norwich Manor, Norfolk, Virginia. Compl. ¶ 2. Joe Federico is a Gunnery Sergeant in the U.S. Marine Corps, who was relocated to Norfolk, Virginia on September 28, 2012, accompanied by his wife Shelley Federico and their minor child, Jaden Federico. *Id.* ¶ 12. Plaintiffs allege their military housing assignment was controlled by LMH, which occupied office space at the Naval Station Norfolk Welcome Center and assigned them housing at 1138 Kings Lynn Drive, Norfolk, Virginia. *Id.* ¶¶ 13–14. Plaintiffs moved into this approximately fifty-year-old home on October 15, 2010. *Id.* ¶ 14. While living in their assigned housing, Plaintiffs allege that they were exposed to excessive moisture and mold conditions, known as "damp indoor space," and as a result suffered contamination of their joint personal property, and personal illness to Shelly Federico. *Id.* ¶ 2. Plaintiffs further allege that they were forced to leave their home as a result of the contamination of their housing and the negligent and improper handling of the damp indoor space conditions by Defendants. *Id.*

In their Complaint, Plaintiffs assert two types of claims: breach of contract and tort. Plaintiffs bring a negligence claim and two negligence per se claims against Defendants for allegedly failing to keep their premises free from toxic mold growths and moisture conditions in accordance with Defendants' duties under Virginia law. *Id.* ¶¶ 102–134. Plaintiffs also pursue claims against Defendants for breach of contract and violations of the Virginia Residential Landlord and Tenant Act, which was incorporated into the lease agreement, for Defendants' alleged failure to maintain Plaintiffs' home in safe and habitable conditions. *Id.* ¶¶ 80–101. Plaintiffs seek property damages in the amount of $250,000, personal injuries in the amount of $3,500,000, and punitive damages in the amount of $500,000. *Id.* 35.

## B. Complaint—Parties and Military Privatization Initiative

As alleged in the Complaint, Defendant LMH is a Delaware Limited Liability Company not registered to do business in Virginia. *Id.* ¶ 3. LMH is an affiliate company of Lincoln Property Company Property Management ("LPC"), an international property acquisition and management company incorporated in Texas and registered to do business in Virginia. *Id.* LPC allegedly manages 31,000 military homes nationwide. *Id.* Plaintiffs allege that LMH owns the subject military housing in addition to over 4,000 other military housing units in the Tidewater Virginia area. *Id.* Under the Department of Defense's Military Housing Privatization Initiative ("MHPI"), discussed further below, LMH and its subsidiaries allegedly own, manage, and operate the military housing under a fifty-year lease-type program. *Id.* In their Notice of Removal, Defendants state that LMH has no connection to the events alleged and that LMH will be moving to dismiss upon removal. Notice of Removal ¶ 2.

As alleged in the Complaint, Defendant Mid–Atlantic is a Delaware Limited Liability Company registered to do business in Virginia. Compl. ¶ 4. It is a subsidiary of Lincoln Family Communities, LLC ("LFC") and is identified as the owner/landlord on the leasing agreements for Plaintiffs' military housing. *Id.* Defendant Lincoln Property Company Property Management, Inc., is a Virginia corporation and is the authorized agent for Mid–Atlantic. *Id.* ¶ 5. It manages the performance of all maintenance activities for Plaintiffs' military housing. *Id.*

To clarify these different companies and relationships, in their Notice of Removal, Defendants characterize Mid–Atlantic's relationship with the Navy as a public-private venture ("PPV") authorized by Congress through the Defense Authorization Act, P.L. 104–106 110 Stat. 186 (1996). Notice of Removal ¶ 10. This act established the Military Housing Privatization Initiative in order to improve the quality of service members' housing. *See* 10 U.S.C. §§ 2871–85. The MHPI is comprehensive legislation which allows the Secretary of Defense to enter into PPVs with private developers to operate and manage military housing. *Id.* § 2875.

Under § 2873, the Secretary may make direct loans to the eligible entity and shall establish such terms and conditions to protect the interests of the United States, including the period and frequency for repayment, and the obligations of the obligors on such loans upon default. Under § 2874, the Secretary may enter into contracts for the lease of housing units suitable for military housing, shall ensure the housing units leased are for military housing, and the lease terms may be for any period the Secretary determines is appropriate and may provide for the owner of the leased property to operate and maintain the property. Under § 2875, the form of investment in a public-private venture may take the form of an acquisition of a limited partnership interest by the United States, a purchase of stock or other equity instruments by the United States, a purchase of bonds or other debt instruments by the United States, or any combination of these forms of investment § 2875 also limits the value of the cash amount of an investment, or the value of land or facilities conveyed as part of an investment in the entity.

§ 2878 allows the Secretary to convey or lease property or facilities to eligible entities for the purposes of using the proceeds of such conveyance or lease to carry out the activities under this subchapter 10 U.S.C. §§ 2871 et seq. § 2883(a) establishes two funds with the Treasury: the Department of Defense Family Housing Improvement Fund and the Department of Defense Military Unaccompanied Housing Improvement Fund. Proceeds from the conveyance or lease of property or facilities and income derived from the activities of this statute are credited to these two funds. § 2883(c). The secretary may use the amounts in these funds to carry out the activities required in connection with the planning, execution, and administration of contracts entered into under the statute. § 2883(d).

In addition to these requirements, the statute also contains reporting and oversight and accountability requirements under §§ 2884 and 2885. Under § 2884(a), the Secretary must transmit a report to the appropriate committees of Congress describing each contract, the contract terms, the authorities utilized in entering into the contract, including the intended method of participation and a justification of that intended method of participation, a statement of the scored cost of the contract, a statement of the United States funds required for the contract in order to finance it, an economic assessment of the life cycle costs of the contract, and whether the contract includes a guarantee if a private party is involved. § 2884(b) requires that in addition to this report, the Secretary of Defense must submit an annual report on the expenditures and receipts of the preceding fiscal year covering each of the Funds established under § 2883, a methodology for evaluating the extent and effectiveness of the authorities of this statute during the preceding fiscal year, recommendations necessary for improving the extent and effectiveness of such authorities in the future, an estimate

for the basic allowance for housing that will be paid, a description of the Secretary's plans for housing privatization activities, and a report on best practices for the execution of housing privatization initiatives, including effective means to track and verify proper performance, schedule, and cash flow, means of overseeing the actions of bondholders to properly monitor construction progress and construction draws, effective structuring of transactions to ensure the United States Government has adequate abilities to oversee project owner performance, and such topics that are identified as pertinent by the Department of Defense, among others.

Finally, § 2885 requires the Secretary to prescribe regulations to effectively oversee and manage military housing privatization projects. § 2885 requires the regulations to include the following requirements: the installation asset manager shall conduct monthly site visits and provide quarterly reports to the assistant secretary for installations and environment on the progress of the construction and renovation of units; all applicable parties shall conduct regular meetings to ensure the that operating and ground lease agreements are in place and adhered to; and other requirements, including required qualifications, bonding levels, reporting of a successor selection in the event of default, and keeping a record of notices of deficiency on contractors and affiliated entities.

In their Complaint, Plaintiffs allege that the MHPI was enacted by Congress in 1996 in response to the deteriorating conditions of military housing and because Congress recognized that family housing was not a core function of the Armed Forces. Compl. ¶ 7. Plaintiffs describe the MHPI as a program designed to grant long-term lease agreements for existing and planned housing to private developers.

*Id.* ¶ 8. The MHPI includes federal grant funding and guaranteed rental income by direct payment of military members' housing allotment. *Id.* Plaintiffs allege that when the MHPI was enacted, Congress recognized that the improvement and expansion of military housing might cost as much as $20 billion, and under the best scenario of government help, the government might contribute up to $3 billion. *Id.* ¶ 10. Thus, Plaintiffs allege that the resulting differential imposed a large burden upon private developers to maximize income, minimize maintenance costs, and emphasize high occupancy rates. *Id.*

Defendants state that Mid–Atlantic is a PPV entity owned by the Navy and Lincoln Family Communities. Notice of Removal ¶ 10. In July 2005, the Navy and LFC entered into a fifty-year ground lease ("Ground Lease") for Norwich Manor and other military housing communities in Virginia and Maryland. *Id.* LFC then assigned this ground lease to Mid–Atlantic, which assumed all of LFC's rights and obligations thereunder. *Id.* This assignment was pursuant to an omnibus assignment agreement acknowledged by the Navy. *Id.* Defendants state that the Navy and LFC, as the sole members of Mid–Atlantic, also entered into an operating agreement ("Operating Agreement") for Mid–Atlantic to "lease, design, finance, demolish, develop, construct, renovate, rehabilitate, own, manage, acquire, sell, operate and maintain residential units, land, and related improvements [in Norwich Manor and other military housing communities] in support of [Navy] and Marine Corps operations." *Id.* According to the terms of the Ground Lease and Operating Agreement, the Navy retained ownership of the land but conveyed ownership of the improvements located on the land to the lessee of the Ground Lease for the term of the Ground Lease. *Id.* ¶ 11.

Finally, Mid–Atlantic retained Defendant Lincoln Property Company Property Management, Inc., to manage the housing and oversee the properties at Norwich Manor in accordance with a separate property management agreement ("Property Management Agreement"), which was required by the Operating Agreement. *Id.* ¶ 12.

### C. Operating Agreement

The Operating Agreement filed under seal with the Court creates the public-private venture, Mid–Atlantic Military Family Communities, LLC between the Navy and Lincoln Family Communities, LLC. Operating Agreement 1, § 2.02. It establishes Lincoln Family Communities, LLC as the Managing Member of Mid–Atlantic, and the Navy as the Navy Member. *Id.* 1. The purpose of the company is to lease, design, finance, demolish, develop, construct, renovate, rehabilitate, own, manage, acquire, sell, operate, and maintain residential units, land, and relative improvements in and around the Navy Region Mid–Atlantic, among other areas. *Id.* § 2.03. Under the terms of the Operating Agreement, the Managing Member LFC was required to make cash capital contributions to Mid–Atlantic over several installments totaling approximately *Id.* § 3.02(a)(i)-(v). The Navy Member was required to make cash capital contributions to Mid–Atlantic in two payments totaling approximately [redacted]. *Id.* § 3.02(b)(i)-(ii).

The Operating Agreement states that the Managing Member LFC "shall have sole and exclusive management and control of the business of the Company." *Id.* § 4.02(b). The recitation of the Managing Member's management responsibilities spans approximately nineteen pages of the Operating Agreement and includes the following: "To sue and be sued, complain, defend, arbitrate, settle or compromise with respect to any claim in favor of or against the Company, in the name and on behalf of the Company, or resort to legal action on, or otherwise adjust, claims or demands of or against the Project or Company." *Id.* § 4.02(b)(vi). The Navy Member, however, retains a large role in many of the decision-making functions involved for Mid–Atlantic, including obtaining additional debt, selling significant assets, declaring bankruptcy, approving the budget and the use of certain capital accounts, [redacted] the right to inspect the property to ensure compliance with environmental laws, and the right to hire a third-party vendor to conduct annual tenant satisfaction surveys. *Id.* §§ 4.02(m), 4.03(c)-(e); Ground Lease § 12.2.3. Indeed, the Managing Member cannot conduct capital improvements it determines are necessary without prior Navy Member approval. Operating Agreement §§ 4.02(m)-(*o*), 5.01(a), (c)(ii), and (d). The Navy Member's Housing Office identifies Preferred Referrals of Qualified Military Tenants who have a preferential right to lease the housing units from Mid–Atlantic. *Id.* § 4.02(j). In addition, the Navy Member sets and may adjust the rental fees for military tenants based on the Basic Allowance for Housing, and may direct the Managing Member to adjust the calculation of the Utility Set Aside. *Id.* § 4.02(j)-(k).

Section 4.05(c) of the Operating Agreement expressly denies indemnification of Mid–Atlantic, the Managing Member, its agents and affiliates by the United States of America, the Department of Defense, and the Department of the Navy. In Section 4.05(d), Mid–Atlantic expressly indemnifies the Navy with the exception of claims of [redacted] misconduct by the Navy, and states that Mid–Atlantic will pay for the Navy Member's defense, judgments, and settlements should an action be taken against the Navy. Importantly, how-

ever, the Operating Agreement does not indemnify the Navy Member from any losses concerning the original capital contributed to the company. The Operating Agreement only limits further liability of the Navy outside of what the Navy has already contributed to the company in capital. Indeed, the agreement specifically states that the Navy shall have no liability for the obligations, debts, or losses of the Company, and shall not be obligated to provide additional funds. *Id.* § 3.07(a).

Mid–Atlantic receives income in the form of rent, which comes from the military tenants' Basic Allowance for Housing provided by the Navy. Article V of the Operating Agreement contains specific requirements for the allocation of project revenues and cash flow distributions for the public-private venture. The Operating Agreement requires Mid–Atlantic to establish several accounts, including a Project Recapitalization Accounts, a Capital Repair and Replacement Account, a Pledged Quality of Life Account, a Surplus Quality of Life Account, and an Operating Reserve Account *Id.* § 5.01(a)-(d). The Capital Repair and Replacement Account and Pledged Quality of Life Account are concerned with the Project Debt for as long as it remains outstanding. *Id.* § 5.01(b)-(c)(i). The Project Recapitalization Account is established and maintained for the benefit of the Project at a national bank or financial institution approved by the Navy Member. *Id.* § 5.01(a). Deposits into this account are made from Gross Operating Revenue distributions as set forth in Section 5.03. *Id.* Funds may be used for payment of operating expenses, emergency repairs or replacement of capital equipment, to accomplish long-term renovation and revitalization of the Housing Unites, to pay Project Debt, to pay Project construction and development costs, and for other purposes as may be agreed by the Navy Member. *Id.* The Managing Member may

only withdraw funds upon the written approval of the Navy Member, and each approved Annual Budget contemplating specific expenditures from this account constitutes written approval. *Id.* Upon termination of Mid–Atlantic, all funds remaining in this account, and the earnings thereon, shall be distributed to the Navy Member. *Id.*

The establishment of, and restrictions placed upon, the Surplus Quality of Life Account are similar to the Project Recapitalization Account. *Id.* § 5.01(c)(ii). Funds in this account may be used to pay operating expenses, debt, and Project development and construction costs, to provide amenities, project improvements, services and recreational facilities, and for such other purposes as may be agreed to by the Navy Member. *Id.* The establishment of, and restrictions placed upon, the Operating Reserve Account are similar to the previous two accounts, except that this is a separate interest bearing account for the sole benefit of the Navy Member. *Id.* § 5.01(d). Funds in this account are intended to be used for Project related purposes. *Id.*

Section 5.03(b) details how the monthly gross operating revenue generated by the Mid–Atlantic Project is to be applied. Each month the cash receipts are first applied to operating expenses, debt service, and fees, and then to other amounts payable and to the project reserve accounts for future expenses. *Id.* § 5.03(b). Once all monthly fees and expenses have been paid, and the proper amount of funds have been distributed to the reserve accounts, [redacted] of the remaining cashflow is distributed to Managing Member. *Id.* § 5.03(b)(xi)(A). The balance of the remaining cashflow, [redacted], is distributed to the Operating Reserve Account, which is the account for the sole benefit of the Navy Member. *Id.*

### D. Ground Lease

The Ground Lease was executed by Mid–Atlantic Military Family Communities LLC and the United States of America, Department of the Navy. Ground Lease 1. For [redacted] the Ground Lease leases land and conveys government facilities to Mid–Atlantic for fifty years "for the purpose of providing sufficient real estate interests to the Lessee in order to carry out the requirements of a Department of the Navy Public/Private Venture." *Id.* 1, §§ 2.1.1, 5.1. Upon termination of the Ground Lease, all Improvements and personal property revert back to the Navy. *Id.* § 2.4. Mid–Atlantic leased the Land, Improvements, and Personal Property from the Navy "in an 'as is' condition without any representation or warranty by the Government concerning their condition, and without obligation on the part of the Government to make any alterations, repairs, or additions." *Id.* § 4.1.

Section 12.1 allocates responsibilities for Pre–Existing Conditions between Mid–Atlantic and the Navy. Specifically, Section 12.1.2 allocates responsibility for mold conditions to Mid–Atlantic, and Section 12.2.8 states that the Government is not responsible for any abatement, removal, or containment of any Mold Condition present in the Improvements. Except for the performance of Development/Management Obligations, the Lessee is not allowed to materially modify or alter the Existing Improvements or the Additional Improvements during the Term of the Lease without prior approval of the Government. *Id.* § 18.3. This restriction does not prohibit the Lessee, however, from making non-structural and cosmetic modifications, alterations, and improvements in general or to comply with its obligations under the Lease. *Id.* Just as with the Operating Agreement, Mid–Atlantic expressly indemnifies the Navy in Section 16.1.

### E. Property Management Agreement

Mid–Atlantic Military Family Communities LLC, the Owner, and LPC Property Management, Inc., the Manager, are the parties to the Property Management Agreement In this agreement Mid–Atlantic appoints LPC exclusively to lease, manage, and operate the Mid–Atlantic Project for a term of [redacted] on as profitable a basis as reasonably possible in compliance with this agreement, the Management Plan, and the Operating Agreement. Property Management Agreement, §§ 1.1–1.2, 2.1. LPC is responsible for managing and directing all leasing activities and shall negotiate and execute leases using the standard form Rental Agreement approved by Mid–Atlantic and the Navy Member. *Id.* §§ 2.1.3, 4.1. For maintenance and repairs exceeding [redacted], and which have not already been specifically identified in the Approved Annual Operating Budget, LPC requires the consent of Mid–Atlantic. *Id.* § 2.1.6. The Property Management Agreement also requires LPC to institute and effectuate a preventative maintenance program, which requires prior approval by Mid–Atlantic for any expenditures exceeding [redacted] in any one instance, or where the aggregate value of contracts for such work in any fiscal year exceeds [redacted], except for recurring expenses within the limits of the Approved Annual Operating Budget or emergency repairs. *Id.*

### F. Norwich Manor

Plaintiffs' military housing is located in Norwich Manor, a housing community in Norfolk, Virginia. Pl.'s Mot. Remand 7–8. Norwich Manor, and other properties in Norfolk and Portsmouth, Virginia were purchased by the Navy in a condemnation action on February 12, 1942 for $122,011. *See United States v. City of Norfolk,* Case

No. 6760 (E.D.Va.1942) (confirming United States obtained title to land which included Norwich Manor); Defs.' Resp. Ex. A. Both parties agree that the federal government gained exclusive jurisdiction over this land acquired through the condemnation action in 1942. *See* Defts.' Resp. 2–3; Pls.' Reply 3.

On May 8, 1984, Leon Kahn, the Director of Real Estate Operations and Natural Resources Division of the Naval Facilities Engineering Command, sent Virginia Governor Charles Robb a letter to adjust the jurisdictional status of lands owned by the Navy in Norfolk, including Norwich Manor, from exclusive jurisdiction of the United States to concurrent legislative jurisdiction with the Commonwealth of Virginia. Defts.' Resp. Ex. B. To effectuate this adjustment, the United States relinquished its exclusive legislative jurisdiction pursuant to 10 U.S.C. § 2683 over all of the land delineated and described in two enclosures to the letter. *Id.* A copy of the plat and the description of certain parcels identified on that plat demonstrate that Norwich Manor was part of the land over which the United States relinquished concurrent legislative jurisdiction to Virginia. Defts.' Exs. B and C. Both parties agree that the federal government and the Commonwealth of Virginia continue to share concurrent jurisdiction over Norwich Manor today. Defts.' Resp. 3–4; Pls.' Reply 3.

## II. Procedural Background

On January 11, 2012, Plaintiffs filed their Complaint in the Circuit Court for the City of Norfolk alleging property damage and personal injury under causes of action for violation of the Virginia Residential Landlord and Tenant Act, breach of contract, negligence, and negligence per se. Compl. ¶¶ 1, 80, 95, 102, 111, 118. On February 10, 2012, Defendants timely filed a Notice of Removal pursuant to 28 U.S.C. §§ 1331, 1441, 1442, and 1446. On March 10, 2012, Plaintiffs timely filed a Motion to Remand this action to state court. Defendants filed a Response, and Plaintiffs filed a Reply. The Court held an initial hearing on the Motion to Remand on June 12, 2012. Due to the complex nature of the companies and parties involved, the Court determined that it would need to review the relevant contracts, specifically the ground lease and operating agreement establishing the public-private venture, before it could rule on the Motion to Remand. After the relevant documents were filed under seal, each party filed a supplemental memorandum on August 27, 2012, regarding the nature of the public-private venture, the Navy's potential liability as a result of this lawsuit, and whether this Court has the jurisdiction to hear this matter. The Court held another hearing on the Motion to Remand on September 13, 2012, and this motion is now ripe for decision.

## III. Applicable Law

### A. *Removal*

Civil actions over which federal courts have original jurisdiction can be removed by the defendant from state court to federal district court pursuant to 28 U.S.C. §§ 1441 and 1442. The party seeking removal bears the burden of establishing federal jurisdiction. *See, e.g., Mulcahey v. Columbia Organic Chem. Co.*, 29 F.3d 148, 151 (4th Cir.1994) (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921)). "Because removal jurisdiction raises significant federalism concerns, we must strictly construe removal jurisdiction." *Id.* (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 61 S.Ct. 868, 85 L.Ed. 1214 (1941)). "Any doubts as to the propriety of the removal are to be resolved in favor

of remand to state court." *Shamrock*, 313 U.S. at 108, 61 S.Ct. 868. 28 U.S.C. 1447(c) states that "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." Therefore, in an abundance of caution, the Court ordered further briefing on this motion and requested to see the documents and contracts creating the public-private venture to ensure that it has no doubts regarding jurisdiction before allowing the case to proceed to discovery and trial.

### B. Federal Question Jurisdiction

Defendants' main argument is that this matter has been properly removed to federal court because this Court has subject matter jurisdiction since the events alleged by Plaintiffs occurred on a federal enclave.[1] Under 28 U.S.C. § 1331, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Federal enclave jurisdiction arises from Article I, section 8, clause 17 of the United States Constitution (the "Enclave Clause"), which provides in relevant part that "Congress shall have the power

... to exercise exclusive Legislation ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, Dock–Yards, and other needful Buildings." The Supreme Court has held that the question whether the United States has acquired exclusive jurisdiction over a federal enclave is a part of the Court's federal question jurisdiction under 28 U.S.C. § 1331. *See Paul v. United States*, 371 U.S. 245, 267, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). A federal enclave can be created by the federal government where it acquires land by purchase or condemnation with the consent of the state or commonwealth in which the land is located. *Id.* at 264, 83 S.Ct. 426.

The question before this Court, however, is not whether Plaintiffs' claims arose on a federal enclave. None of the parties dispute that Plaintiffs' claims arose on a federal enclave over which the United States and the Commonwealth of Virginia share concurrent jurisdiction. The question for this Court to determine is whether federal jurisdiction is proper for state law claims arising on a federal enclave over which there is concurrent jurisdiction.[2] The case

---

**1.** Defendants originally removed this action to federal court on three independent bases: (1) pursuant to 28 U.S.C. § 1331, because the events alleged in the Complaint occurred within a federal enclave; (2) pursuant to 28 U.S.C. § 1442(a)(1), because at all relevant times Mid–Atlantic and LPC were acting under a federal officer; and (3) pursuant to 28 U.S.C. § 1442(a)(1), because Mid–Atlantic is a federal agency. Since filing its Notice of Removal, however, the United States has requested that Defendants withdraw their arguments under section 1442(a)(1). Defendants have agreed to that request and withdrawn those arguments. The United States has not taken a position on Defendants' assertion of federal enclave jurisdiction.

**2.** Plaintiffs' cite numerous cases, including *Nicodemus v. Union Pac. Corp.*, 440 F.3d 1227 (10th Cir.2006) and *Pinney v. Nokia, Inc.*, 402

F.3d 430 (4th Cir.2005), in support of the well-pleaded complaint rule that a cases arises under federal law, for the purposes of federal question jurisdiction, if its well-pleaded complaint establishes either that federal law creates the cause of action or that a plaintiffs right to relief necessarily depends on resolution of a substantial question of federal law. The Court finds that Plaintiffs' reliance on the well-pleaded complaint rule in this case is misplaced since none of the cases cited by Plaintiffs in this regard occurred on a federal enclave. Thus, the facts of this case are completely distinguishable from all of the well-pleaded complaint rule cases cited by Plaintiffs. Indeed, as the Court discusses in this opinion, the case law is clear that claims arising on a federal enclave provide a separate and independent basis for federal question jurisdiction.

law cited by the parties demonstrates that there are varied opinions on this question. This case is further complicated by the fact that it is distinguishable from the other cases because of the unique situation that a public-private venture is involved. The Court has thoroughly researched the case law, and this case involving a public-private venture on a federal enclave appears to be the first of its kind in the country.

Some federal courts, including the Fourth Circuit, have interpreted the Enclave Clause to permit removal of claims filed in state court if the events alleged in the complaint occurred on a federal enclave. *See, e.g., Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir.2006) (upholding removal of tort claim to federal court where the tort allegedly occurred on a federal enclave); *Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034 (10th Cir.1998) (finding that "personal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as part of federal question jurisdiction"); *Stokes v. Adair*, 265 F.2d 662, 665–66 (4th Cir.1959) (finding federal district court possessed jurisdiction over non-diverse parties for personal injuries on a federal enclave); *Mater v. Holley*, 200 F.2d 123, 124–25 (5th Cir. 1952) (finding that federal courts have jurisdiction over torts committed on federal enclaves).

In *Durham*, where the complaint revealed that some of the plaintiff's claims arose on federal enclaves, the Ninth Circuit stated clearly that "federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" 445 F.3d at 1250. The Ninth Circuit cited one of its previous decisions, *Willis v. Craig*, 555 F.2d 724, 726 n. 4 (9th Cir. 1977). In *Willis* a civilian employee of the United States Navy was injured while working at Concord Naval Weapons Station in California. The Ninth Circuit remanded the case back to the district court for further factual findings before ruling on the question of jurisdiction because it found that there were issues concerning how the government acquired the property on which the tort occurred. However, the court stated that it had "no quarrel with the propriety of enclave jurisdiction in this case (if the facts support it), even though the state courts may have concurrent jurisdiction." *Id.* Thus, the Ninth Circuit found that the existence of a state court forum for a suit on account of the state's concurrent jurisdiction alone does not defeat a federal court's jurisdiction to hear a state tort law claim arising on a federal enclave. The court found that the best reasoning concerning this issue was found in an opinion by the Fifth Circuit in *Mater v. Holley*, 200 F.2d 123 (5th Cir.1952).

*Mater* involved a negligence action that occurred within the boundaries of Fort McPherson located in the state of Georgia. *Id.* The Fifth Circuit found that Fort McPherson was a federal enclave in that the lands comprising Fort McPherson were duly ceded to the United States by the State of Georgia. *Id.* Georgia only retained concurrent jurisdiction for the service of state process and the regulation of public utilities on the fort. *Id.* The court noted that there was a "striking diversity of opinion" on the subject of whether there is federal jurisdiction for an action for personal injuries suffered on a military reservation under the exclusive jurisdiction of the United States. *Id.* at 124. After reviewing those decisions and relevant case law, the Fifth Circuit found that the federal courts do have jurisdiction over such an action.

In support of this holding, the Fifth Circuit analyzed the Supreme Court's decision in *Chicago, Rock Island & Pacific Ry.*

*Co. v. McGlinn,* 114 U.S. 542, 5 S.Ct. 1005, 29 L.Ed. 270 (1885) in which the Supreme Court "declared the rule to be that when legislative power over territory is transferred from one sovereign to another, the then existing laws of the surrendering sovereign for the protection of private rights, so far as consistent with the laws of the new sovereign, continue in force until abrogated or altered by the new sovereign." *Id.* In *Chicago,* the Supreme Court applied this principle to the cession by a state to the United States of land for a military reservation such as was involved in *Mater.* 114 U.S. at 546, 5 S.Ct. 1005. As both cases found, "This assures that no area, however small, will be left without laws regulating private rights." *Mater,* 200 F.2d at 124; *see also Chicago,* 114 U.S. at 546, 5 S.Ct. 1005. For example, in *James Stewart & Co. v. Sadrakula,* 309 U.S. 94, 101–05, 60 S.Ct. 431, 84 L.Ed. 596 (1940) the Supreme Court held that a section of the New York Labor Law, Labor Law N.Y. § 241, remained in effect as federal law on lands ceded to the United States for a post office site until such time as Congress provided federal safety regulations in that area. In addition, the *Mater* Court also noted that 16 U.S.C. § 457 expressly adopts as federal law the local law of liability for negligence and wrongful death for places over which the United States has exclusive jurisdiction. *Mater,* 200 F.2d at 124.

Thus, the Fifth Circuit stated that "It seems indubitable that any law existing in territory over which the United States has 'exclusive' sovereignty must derive its authority and force from the United States and is for that reason federal law, even though having its origin in the law of the state within the exterior boundaries of which the federal area is situated." *Id.* Based on this reasoning, the Fifth Circuit concluded that when "this area was ceded by Georgia to the United States, Georgia

law as such, and by virtue of Georgia sovereignty ceased to exist, but remained operative as federal law by virtue of the sovereignty of the United States." *Id.* Even though the state retained limited concurrent jurisdiction, the court found that "Existing federal jurisdiction is not affected by concurrent jurisdiction in state courts." *Id.* Thus, the law appears clear that "where exclusive jurisdiction is ceded to the United States, the laws of the state at the time of cession will continue in effect as federal law, and subject matter jurisdiction under 28 U.S.C. § 1331 is proper." *Melendez v. Glastic Corp.,* No. 2:95CV1112, 1996 U.S. Dist. LEXIS 4537, at *5 (E.D.Va. March 7, 1996) (citing *James Stewart & Co. v. Sadrakula,* 309 U.S. 94, 97, 60 S.Ct. 431, 84 L.Ed. 596 (1940)).

The Fourth Circuit has also cited *Mater* with approval in *Stokes v. Adair,* 265 F.2d 662 (4th Cir.1959). In *Stokes,* two Virginians sustained injuries in an automobile accident on Fort Leavenworth military base in Kansas, which was a federal enclave with exclusive federal jurisdiction. Kansas only retained the right to serve civil and criminal processes and the right to tax railroad property within the enclave. *Id.* at 664. The Fourth Circuit found that the district court had jurisdiction both "under the general rule of law applicable when exclusive jurisdiction over territory is ceded by a state to the United States, and also under the express provisions of [16 U.S.C. § 457]." *Id.* at 665–66. The Fourth Circuit further held that the decision did not mean that an action for personal injuries inflicted on a federal reservation could not also be tried in a state court. *Id.* at 666.

It is important to note, however, that the level of concurrent jurisdiction in *Mater* and *Stokes* was much less than the level of concurrent jurisdiction the Com-

monwealth of Virginia has in the matter presently before the Court. In fact, the courts in the cases discussed above considered the federal jurisdiction in those cases to be exclusive except for the very limited reservations made by the states involved. Furthermore, other cases cited by Defendants, such as *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964), are not as instructive for the Court with the facts presently before it because those cases involve exclusive federal jurisdiction over an enclave as well. In *Waggonner* the United States acquired exclusive jurisdiction over land located in Louisiana except for the state's express reservation as to civil and criminal process. The Supreme Court found that in leasing the right to exploit parts of the enclave used as an Air Force base, the United States did not lose its power to exercise exclusive jurisdiction over the parts of the enclave that it had leased. *Id.* at 860.

Nevertheless, it appears that in *Durham* and *Willis* the Ninth Circuit has extended the reasoning in *Mater* to cases of full concurrent jurisdiction as well. *Akin v. Big Three Industries, Inc.*, 851 F.Supp. 819, 822 (E.D.Tex.1994) also furthers the reasoning set out in *Mater*. *Akin* was a toxic tort case brought by approximately two hundred United States Air Force employees against a manufacturer involving alleged chemical exposure at Tinker Air Force Base in Oklahoma. Citing *Mater* the *Akin* district court found that there should be a federal forum in which to litigate controversies arising on federal enclaves to prevent state judicial interference with "matters likely to involve substantial federal interests." *Id.* The court stated that the plaintiffs' argument that state courts have concurrent jurisdiction over transitory tort actions "misses the point" because "the state court's concurrent jurisdiction is irrelevant to the issue whether a federal question is presented. Many federal questions may be heard concurrently in a federal system. The removal statutes permit a defendant to exercise the option of having a federal question decided by a United States court." *Id.* at n. 1. Along these lines, the court found that the case presented a "compelling argument for holding that federal enclave jurisdiction exists over the tort claims" because the "Air Force is entrusted with this nation's defense . . . the Air Force entreated plaintiffs to perform important maintenance tasks on jet engines . . . all plaintiffs performed all duties on Tinker Air Force Base . . . [a]nd the plaintiffs now claim that these very duties—repairing jet engines—resulted in personal injuries." *Id.* Thus, the court held that when toxic exposure tort claims arise out of exposure to chemicals on a base in furtherance of their employment duties on that base, then enclave jurisdiction was properly invoked. *Id.* The Tenth Circuit upheld the ruling of the district court and found that personal injury actions which arise from incidents occurring on federal enclaves may be removed to federal district court as part of federal question jurisdiction. *See Akin v. Ashland Chemical Co.*, 156 F.3d 1030 (10th Cir.1998).

In opposition to the rulings of the Ninth and Tenth Circuits, Plaintiffs rely primarily on a holding in the Eastern District of Virginia by Magistrate Judge Tommy Miller, *Melendez v. Glastic Corp.*, No. 2:95CV1112, 1996 U.S. Dist. LEXIS 4537, at *5 (E.D.Va. March 7, 1996). In *Melendez*, the court examined *Mater* and *Akin* but expressly disagreed with the *Akin* analysis. *Id.* at *8–*9. Instead, the court found the cases of *Fowler v. Dodson*, 159 F.Supp. 101 (E.D.Pa.1958), *Pratt v. Kelly*, 585 F.2d 692 (4th Cir.1978), and *Sylvane v. Whelan*, 506 F.Supp. 1355 (E.D.N.Y.1981) to be more persuasive. In *Fowler*, an

automobile collision between two citizens of Pennsylvania occurred in the Shenandoah National Park in Virginia. This national park was under the concurrent civil jurisdiction of the United States and the Commonwealth pursuant to Virginia Code § 7–22 (1950), and the court found that since there was no diversity between the parties, it did not have jurisdiction over the action. *Id.* at 103–04. Importantly, however, the court in *Fowler* never found that the events in that action occurred on a federal enclave or that the United States at any time had had exclusive jurisdiction over the lands in question, which it then ceded back to the Commonwealth.

In filing their suit, the plaintiffs in *Fowler* relied for jurisdiction upon the Act of August 19, 1937, § 1, 16 U.S.C. § 403c–1(g), as amended, which, with its preamble, in pertinent part provides the following:

> In order to provide for uniform Federal jurisdiction over … Shenandoah National Park, the provisions of the Act of the General Assembly of the Commonwealth of Virginia, approved April 1, 1940, fixing and defining the respective jurisdiction and powers of the Commonwealth of Virginia and the United States and ceding to the United States exclusive police jurisdiction overall lands … within the park are hereby accepted and such exclusive jurisdiction is assumed by the United States over such lands.…The courts of the Commonwealth of Virginia shall have concurrent jurisdiction with the courts of the United States of all civil causes of action arising on said lands to the same extent as if the cause of action had arisen in the county or city in which the land lies outside of the park area. *Id.* at 101–02.

Based on this statute, the defendants argued that no jurisdiction of the tort action was conferred on the federal courts because the statute "plainly related to a re-

tention of jurisdiction by the state courts, and was not intended to confer, by implication, any new or additional jurisdiction on district courts in civil causes of action." *Id.* at 102.

After analyzing the legislative history of the act, the court agreed with the defendants' interpretation of the statute. The court found that the main purpose of the statute was to "reconcile questions relating to federal jurisdiction over the Park [since] the United States had exclusive jurisdiction only as to 'conveyed' lands and concurrent jurisdiction as to the remainder." *Id.* at 103. Thus, in order to correct this situation, Virginia, in 1940, enacted a law "which ceded to the United States, with certain reservations, exclusive criminal and police jurisdiction over the Park, but reserved concurrent civil jurisdiction." *Id.* In further analyzing the statutory history the court held the following:

> Congress apparently designed the 1942 amendment to § 403c–1 of the 1937 Act primarily to accept this cession formally in order to enable the administration of the laws and regulations applicable to the Park to be carried out more efficiently. H.Rep.No. 1795, 77th Cong.2d Sess. (1942). Section 403c–1(g), upon which plaintiffs rely, appears to have been included in this amendment to acknowledge and accept Virginia's reservation of concurrent jurisdiction over civil causes of action and not to confer on district courts a new jurisdiction over civil actions merely because they arose within the Park. The latter conclusion does not appear expressly in the Report but is reasonably inferable therefrom. This conclusion is also supported by the fact that the language in 403c–1(g) was taken almost verbatim from the 1940 Virginia statute. It is reasonable to conclude that, having no power to confer jurisdiction on federal courts, Virginia,

in enacting its own statute in the language later embodied by Congress in 403c–1(g), intended only to preserve its traditional jurisdiction and, that Congress, in adopting the very language of the Virginia statute, intended no more. *Id.*

Thus, the court found that with regard to this Virginia statute and the subsequent federal statute, Virginia never intended to cede concurrent jurisdiction over civil causes of action to the United States and instead meant to expressly reserve the Commonwealth's jurisdiction over civil causes of action. As such, the Shenandoah National Park was never exclusively part of a federal enclave, and the preexisting state law never became part of federal law over actions arising on that land.

*Pratt* involved an automobile accident on the Blue Ridge Parkway in Virginia. Similar to *Fowler* it involved national park lands ceded to the United States, and as in *Fowler,* the Commonwealth ceded lands without transferring exclusive jurisdiction to the United States. Indeed, once again, the Commonwealth retained jurisdiction in civil matters: "The Commonwealth of Virginia hereby further reserves unto herself exclusive governmental, judicial, executive and legislative powers, and jurisdiction in all civil and criminal matters, except in so far as same may be in conflict with the jurisdiction and powers herein ceded to the United States." *Pratt,* 585 F.2d at 697. Thus, the Fourth Circuit held that it did "not think that § 457 is intended to confer federal question jurisdiction in territory in which the United States does not have exclusive jurisdiction." *Id.* Since, under 16 U.S.C. § 457, only on a federal reservation in which exclusive jurisdiction has been obtained by the United States does a state's civil statute become a law of the United States, and since Virginia had expressly reserved jurisdiction in civil cases, the court held that federal question juris-

diction did not exist under either 28 U.S.C. § 1331(a) or 16 U.S.C. § 457. Once again, the court did not find that the cause of action arose on a federal enclave over which the United States had exclusive jurisdiction at any point.

*Sylvane* involved a suit by residents of several communities living nearby to a national recreation area who sought to abate the alleged nuisance of nude bathing. Similar to both *Fowler* and *Pratt,* the court in *Sylvane* found that the state of New York qualified its cession of land to the federal government by reserving concurrent jurisdiction. *Sylvane,* 506 F.Supp. at 1361. The court used the analysis by the Fourth Circuit in *Pratt* and by the Eastern District of Virginia in *Bd. of Sup'rs of Fairfax County, Virginia v. U.S.,* 408 F.Supp. 556 (E.D.Va.1976) and found that "once the state cedes concurrent jurisdiction (in this case, indeed, reserving unto itself exclusive civil jurisdiction) the rationale for applying 'federalized' state law as the basis for § 1331 jurisdiction disappears ... [because] 'litigants are afforded a forum with a developed legal system in which to resolve disputes.'" *Sylvane,* 506 F.Supp. at 1361 (quoting *Bd. of Sup'rs,* 408 F.Supp. at 564). Importantly, all three of these cases involved land ceded to the United States in which the states involved reserved concurrent jurisdiction. In the case at bar, the United States had exclusive jurisdiction over the land in question until it ceded concurrent jurisdiction back to the Commonwealth.

*Melendez,* which was decided in this division of the Eastern District of Virginia, involved land in the same federal enclave that is presently before the Court. However, it is important to note that the land involved in *Melendez* was acquired differently, and at a later date, than the land

involved in the case presently before the Court. In *Melendez* an explosion occurred on the Norfolk Naval Base in a vault located on one of the piers. The plaintiff was installing a circuit breaker at the time and sought damages under state law theories of liability. These are the only facts presented by the court in its decision. The part of the naval base on which the accident occurred in *Melendez* was purchased by the United States in 1963. 1996 U.S. Dist. LEXIS 4537, at *4. In ceding this land to the United States, the Commonwealth reserved concurrent jurisdiction with the United States "with respect to the commission of crimes and the arrest, trial and punishment therefor." *Id.* at *5. After reviewing many of the cases previously discussed above, the court disagreed with the *Akin* analysis of concurrent jurisdiction and found that the mere fact that "injuries occurred to a federal employee on the Norfolk Naval Base is insufficient to raise a federal question." *Id.* at *9. Thus, the court held that "where a state shares concurrent jurisdiction with the federal government over an area where a state cause of action arises, that state court is the proper forum for deciding the case. In this situation, a federal court should not apply the substantive law of the state as 'federal law,' and decide the state cause of action over which it has no further basis for jurisdiction." *Id.* The court concluded that, since concurrent jurisdiction existed over the land in question, the laws of the Commonwealth upon which that action was based did not continue in effect as federal law conferring original jurisdiction under 28 U.S.C. § 1331. As the Court discusses further below, it finds that the *Melendez* decision is a misreading of the case law upon which it relied to come to that conclusion.

Finally, one last case which bears upon the Court's consideration of this case is *United States v. Schuster*, 220 F.Supp. 61 (E.D.Va.1963). This was a criminal prosecution for the unauthorized use of an automobile taken from a Norfolk Naval Base parking lot. The defendant moved to dismiss the indictment and argued that the federal government lacked jurisdiction over the case. The land in question in this case had been leased by the federal government for the purposes of the naval base:

By letter dated August 23, 1957, the Assistant Secretary of the Navy advised the Governor of Virginia that the United States held, by five separate leases, approximately 171.84 acres of land and improvements lying within the City of Norfolk, Virginia, which land (including the parcel which is the locus of the alleged crime) was acquired for naval purposes. The Navy, acting in behalf of the United States, accepted concurrent jurisdiction over the property 'in the manner and form granted and ceded by an Act of the General Assembly of the Commonwealth of Virginia approved April 1, 1940,' incorporated into the Code of Virginia, 1950, as § 7–19. Section 7–19 of the Code of Virginia, 1950, provides in part: 'The conditional consent of the Commonwealth of Virginia is hereby given to the acquisition by the United States, or under its authority, by purchase, lease, condemnation, or otherwise, of any lands in Virginia, whether under water or not, from any individual, firm, association or body corporate, for sites for customs houses, courthouses, arsenals, forts, naval bases, military or naval airports or airplane landing fields or for any military or naval purpose. Over all lands acquired by or leased or conveyed to the United States pursuant to the conditional consent herein conferred, the Commonwealth hereby cedes to the United States concurrent jurisdiction, legislative, executive and judicial,

with respect to the commission of crimes and the arrest, trial and punishment therefor.' *Id.* at 63–64.

With regard to the issue of concurrent jurisdiction, Judge Hoffman found that Virginia had clearly ceded concurrent jurisdiction to the United States for crimes committed on the property leased by the United States for the purpose of the naval base. *Id.* at 64. The court further held that it was "clear that such cessions of jurisdiction, motivated by the comity between sovereigns, have been found to be lawful and proper for the reason that they are necessary in order to secure the great public benefits intended to be derived from the dedicated area." *Id.* The court found that this jurisdictional question was of "major importance to the enforcement of criminal laws over offenses committed within the 'special maritime and territorial jurisdiction of the United States,'" and held the court had jurisdiction as a result of the state's cession of concurrent jurisdiction. *Id.* 62–64. Thus, in essence the court found that when the United States and the Commonwealth had concurrent jurisdiction over criminal matters, it was appropriate for a federal district court to retain jurisdiction over the prosecution of a crime that occurred on a federal enclave when federal interests were involved. Judge Hoffman's reasoning is also instructive for the Court in considering the case presently before it.

## IV. Analysis

### A. Federal Enclaves and Concurrent Jurisdiction

As discussed above, there is no dispute in this matter that concurrent jurisdiction exists over Norwich Manor. Plaintiffs argue that the Enclave Clause only applies to federal lands within exclusive federal legislative jurisdiction. Therefore, since concurrent jurisdiction exists here, the state court is the proper forum for this action. Defendants disagree and argue that in order for a federal court to have original jurisdiction pursuant to the Enclave Clause, there does not need to be exclusive federal jurisdiction over the land in question. After having analyzed the relevant case law, and the facts and holdings of all of the cases cited, the Court finds that the *Akin* case is most instructive for providing the best analysis and legal reasoning to determine whether or not a federal court has federal question jurisdiction over a federal enclave over which there is concurrent federal and state jurisdiction.

The Court respectfully disagrees with the analysis and holding in *Melendez.* In *Melendez* the court blankly refused the notion that federal question jurisdiction can exist over state law claims that arise on a federal enclave over which there is concurrent jurisdiction. This Court finds that *Melendez's* blanket refusal goes too far because it completely disregards a more thorough analysis of the claims and parties involved to see if a sufficient federal question is involved. The Court disagrees with *Melendez's* application *of Fowler, Pratt,* and *Sylvane* to the facts in *Melendez* and finds that the present case is distinguishable from all of those cases.

Significantly, as discussed above, *Fowler, Pratt,* and *Sylvane* all involved instances in which the Commonwealth of Virginia or another state ceded land to the United States while reserving concurrent jurisdiction. Thus, those courts found that their cases were distinguishable from the *Mater* line of cases because the United States never received exclusive federal jurisdiction over those parcels of land, and thereby state law never became federal law for claims arising on that land either through the reasoning set out in *Mater* or through the application of 16 U.S.C. § 457. In-

deed, the court in *Fowler* went through a detailed analysis of the legislative history of the federal statute codifying the cession of land from Virginia to the United States and found that the Virginia legislature never intended to cede jurisdiction for civil causes of action arising on that land at all. Therefore, *Melendez's* reliance on these decisions was misplaced because the land on the Norfolk naval base where the accident occurred in that case was purchased by the United States, and Virginia only reserved concurrent jurisdiction with respect to matters of criminal law, criminal and civil process, and certain limited rights to tax. 1996 U.S. Dist. LEXIS 4537, at *4. Virginia had the ability to reserve concurrent jurisdiction with regard to civil causes of action, but, since it did not, the state law as it existed when the land was purchased continued in existence as federal law.

Subsequently, in 1984, the Navy relinquished its exclusive legislative jurisdiction over land on the Norfolk Naval Base to a concurrent legislative jurisdiction with the Commonwealth of Virginia. Applying the *Fowler, Pratt,* and *Sylvane* to the issue of concurrent jurisdiction before it in *Melendez,* the court there found that the laws of Virginia on which that action was based did not continue in effect as federal law conferring original jurisdiction. However, as this Court has shown, that is a misreading of the holdings in *Fowler, Pratt,* and *Sylvane* because the concurrent jurisdiction at issue in those cases was distinct from the concurrent jurisdiction at issue with regard to Norfolk Naval Base because the laws of Virginia had in fact continued in effect as federal law when the United States purchased that land.

The court in *Melendez* also based its decision on the fact that a forum existed for the plaintiff's action in state court, and since there was concurrent jurisdiction over an action involving state law claims, the state court was the proper forum for deciding the case. However, the *Melendez* court adopted the language it used from the *Sylvane* decision, which in turn had been quoting the *Bd. of Sup'rs* decision.[3] This is important to note because, as discussed above, in *Bd. of Sup'rs,* that case involved facts under which the Commonwealth of Virginia had ceded concurrent jurisdiction but had also explicitly reserved for itself exclusive civil jurisdiction. 408 F.Supp. at 564. That is completely different from the type of concurrent jurisdiction between the United States and the Commonwealth in both *Melendez* and this case because Virginia has not reserved exclusive civil jurisdiction. Thus, tracing back the language used and the cases cited in *Melendez,* this Court disagrees strongly with the basis for the *Melendez* court's holding.

■■■ This Court finds that the fact that a forum also exists in state court does not mean that the state court has to be the only forum in which a claim can be heard. Indeed, that is the very reason why this Court finds the *Akin* analysis to be the most appropriate when deciding whether a federal court has jurisdiction to hear state law claims arising on a federal enclave over which there is concurrent jurisdiction. The Fifth, Ninth, and Tenth Circuits have found that concurrent jurisdiction alone does not divest a federal court from jurisdiction to hear state law claims arising on a federal enclave. *See* discussion *supra* regarding *Durham v. Lockheed Martin Corp.,* 445 F.3d 1247 (9th Cir.2006); *Akin v. Ashland Chemical Co.,* 156 F.3d 1030 (10th Cir.1998); *Willis v. Craig,* 555 F.2d

---

**3.** The Court notes that when citing *Sylvane,* the *Melendez* court omitted *Sylvane's* citation of *Bd. of Sup'rs.*

724 (9th Cir.1977); *Mater v. Holley,* 200 F.2d 123 (5th Cir.1952). The *Akin* district court analysis upheld by the Tenth Circuit takes into consideration the nature of the claims and the parties involved to determine whether there are substantial federal interests involved which thereby make it proper for a federal court to maintain jurisdiction. As the *Akin* district court stated, and the Tenth Circuit upheld, "the state court's concurrent jurisdiction is irrelevant to the issue whether a federal question is presented." *Akin v. Big Three Industries, Inc.,* 851 F.Supp. 819 (E.D.Tex. 1994).

This proposition that the state court's concurrent jurisdiction is irrelevant to the issue of whether substantial federal interests are involved is also supported by Judge Hoffman's holding in the criminal matter of *United States v. Schuster,* 220 F.Supp. 61 (E.D.Va.1963) discussed above, which also occurred on Norfolk Vaval Base.[4] Judge Hoffman clearly found that there was concurrent jurisdiction over criminal matters. Even though there was a state forum in which to prosecute the defendant in that case, that alone did not preclude federal jurisdiction. Given that the automobile theft of a servicemember's car occurred on a federal enclave, the court found that it was important for a federal court to enforce state criminal laws that affect the special maritime and territorial jurisdiction of the United States.

■ For the foregoing reasons, the Court finds that the court's reasoning in

*Akin* is most persuasive for analyzing the legal issues before it on this motion to remand. This Court agrees with *Akin* that there should be a federal forum in which to litigate controversies arising on federal enclaves—even when there is concurrent jurisdiction, the complaint involves state law claims, and a state forum also exists—in order to prevent state judicial interference with "matters likely to involve substantial federal interests." 851 F.Supp. at 822. As in *Akin* the plaintiffs' argument here that their claims are solely state law claims "misses the point" because there is no dispute that their claims arise on a federal enclave, and "the state court's concurrent jurisdiction is irrelevant to the issue whether a federal question is presented." *Id.* The case law cited above is clear that "Many federal questions may be heard concurrently in a federal system [and] [t]he removal statutes permit a defendant to exercise the option of having a federal question decided by a United States court." *Id.* at n. 1. This Court finds that concurrent jurisdiction over an enclave on which a claim arises alone does not automatically bar a federal court from hearing state law claims. Rather a court must determine whether the case before it presents a "compelling argument for holding that federal enclave jurisdiction exists over the tort claims." *Id.* For the reasons set forth in greater detail below, this Court finds that the matters involved in this case present substantial federal interests and provide a compelling argument to hold that federal jurisdiction is proper.

---

4. See also *McWilliams, Jr. v. Metro. Life Ins. Co.,* 172 F.3d 863 at n. 1 (4th Cir.1999) where the Fourth Circuit stated that "this court has consistently held that concurrent jurisdiction does not defeat a defendant's right to removal." *See Whitfield v. Federal Crop Ins. Corp.,* 557 F.2d 413, 414 (4th Cir.1977) (holding that where federal and state courts have concurrent jurisdiction Congress must expressly provide for nonremovability to prevent removal);

*Callison v. Charleston Area Med. Ctr., Inc.,* 909 F.Supp. 391, 394 (S.D.W.Va.1995) (holding that concurrent jurisdiction with the state courts does not preclude removal on original jurisdiction grounds). Although these cases do not involve federal enclaves, there are instructive for demonstrating that the Fourth Circuit has not viewed concurrent jurisdiction over claims as automatically precluding jurisdiction in federal court.

## B. Federal Interests Implicated

Another way in which Plaintiffs' case is distinguishable from the *Fowler, Pratt,* and *Sylvane* cases is that it presents substantial federal interests. *Fowler, Pratt,* and *Sylvane* all involved tort actions occurring on national parks or recreation areas involving private citizens. Aside from the fact that the claims arose on federal land over which there was concurrent jurisdiction over civil causes of action, none of those cases implicated federal interests. There is no question, however, that this case involves unique and significant federal interests. A review of the Complaint, the facts, the parties, and the nature of the public-private venture reveal that almost everything in this case implicates the United States Navy in one form or another.

■ Plaintiff Joe Federico is a Gunnery Sergeant in the United States Marine Corps. Plaintiffs allege that their military housing assignment was controlled by Defendants who occupied office space at the Norfolk Naval Base welcome center and assigned military housing. Plaintiffs moved into a home in Norwich Manor, which is land located on a federal enclave over which there is concurrent jurisdiction. Plaintiffs allege that they were exposed to mold and excessive moisture conditions in the home they leased.

In an effort to allow the various branches of the Armed Services from getting out of the business of being landlords, Congress passed the Military Housing Privatization Initiative, which allowed the Navy in this case to enter into a public-private venture to run military housing. Thus, the entire initiative involved in this case flows from, and is governed by, a federal privatization program, which has strict reporting requirements that obligate the Secretary to report to Congress on plans for housing privatization activities and best practices for the execution of housing privatization initiatives. Indeed, Plaintiffs even allege in their Complaint that the structure and incentives created by this federal initiative imposed a large burden upon private developers to maximize income, minimize maintenance costs, and emphasize high occupancy rates to the detriment of military personnel. As discussed in detail above with regard to the contracts establishing and governing the public-private company at issue in this case, Mid–Atlantic, and its property manager LPC, the Navy owns all of the property involved in this case. The Navy built the home in question and owns the land on which the home sits. For the purposes of its involvement in Mid–Atlantic, the Navy has leased the land and conveyed the homes to Mid–Atlantic. However, the Navy still owns the homes. In total the Navy has conveyed 5,500 housing units and related improvements to this public-private entity, and has made $169,938,000 in capital contributions. [redacted] The Navy will receive all land improvements and much of the proceeds remaining in the public-private venture when it dissolves after fifty years.

As discussed in great detail above concerning all of the contracts and agreements, the Navy plays a significant role in the operation of Mid–Atlantic. For example, the Navy must approve additional debt, the selling of significant assets, declaring bankruptcy, and the annual operating budget and the use of certain capital accounts. The Navy [redacted], has the right to inspect the property to ensure compliance with environmental laws, and has the right to hire a third-party vendor to conduct annual tenant satisfaction surveys. In addition, the Navy sets the rental fees and the terms of the lease agreement and may adjust the calculation of the utility set aside.

In essence Mid–Atlantic receives income in the form of rent. The amount of rent

and the terms of the rental agreement are set by the Navy. The Navy gives its service members a Basic Allowance for Housing, which they use to pay rent to Mid–Atlantic. Thus, the Navy provides the housing for the tenants, furnishes the tenants, and provides the tenants with the money to pay the rent set by the Navy. Basically, simplifying this military housing privatization initiative, it is clear that this is a real estate venture with a management company, and everything, including the structure of the management company, involves the Navy. Plaintiffs' argument is essentially that a federal question is not presented because someone else is handling the money that comes in and manages some, but not all, of the day-to-day operations of the company.

The Court finds that the Navy has meaningful control over the operations of Mid–Atlantic and the management of the housing communities formerly run exclusively by the Navy. The agreements governing Mid–Atlantic make it clear that the Navy exercises control and influence over the policies and procedures concerning military housing in the enclave. For example, although it has created Mid–Atlantic, which uses LPC to manage the property, the Navy nevertheless still encourages service members to report any potential health and safety issues so that the Navy can work with its sailors to resolve the problem. *See* http://navylive.dodlive.mil/2012/08/03/navy-housing-helping-us-help-you/ (stating "Should a health or safety issue arise during a Sailor's stay in Navy barracks, government owned, or privatized family housing, we'll work with the Sailor as an advocate for their needs until we find a solution.").

Plaintiffs' cite Delaware limited liability law and the indemnity provisions of the agreements as evidence that Mid–Atlantic is a completely separate and private entity insulating the Navy from any liability that may arise in this case. Under Delaware law limited liability companies are created to shield the members from the liabilities of the company. Del.Code Ann., Tit. 6, § 18–108. In this case, each member of Mid–Atlantic has contributed capital to the operations. Once contributed, under the Delaware law governing the operating agreement, the capital contributions are company assets and are no longer the property of the individual members. Operating Agreement, § 10.02. Furthermore, Plaintiffs argue that the Navy has no further funding obligations to Mid–Atlantic: "Nothing in this Agreement shall be construed to obligate the United States of America or any agency thereof to provide additional funds for this Project ... The Navy member shall not be liable for providing any funds that might be necessary to complete and carry out the Project" Operating Agreement, §§ 3.01(d), 3.04(a).

Solely because the capital contributions made by the Navy are now the property of Mid–Atlantic, and because the Navy is indemnified from making any further contributions to Mid–Atlantic, does not mean that significant federal interests are not implicated by this lawsuit, or other potential lawsuits. As discussed above, the Operating Agreement clearly lays out specific requirements concerning the distribution of the operating cash flow. Once monthly fees and expenses have been paid and the requirements of other reserve accounts have been satisfied, [redacted] of the remaining amount from the cash flow is sent to the Managing Member–Lincoln Military Housing. The remaining [redacted] is placed in the Operating Reserve Account, which is a separate interest bearing account for the sole benefit of the Navy member. Thus, it is clear that the Navy has an ongoing financial interest in the operation of Mid–Atlantic and that the Navy's financial interests will be directly

affected by the outcome of this litigation. Indeed, the Court cannot view this case in a vacuum and must consider the consequences of its decision to find that it has jurisdiction over this matter.

This case is one of nine cases that have already been filed in state court. Plaintiffs' counsel has not served Defendants in eight of these cases because they are awaiting this Court's ruling on jurisdiction. Defendants state that there are potentially more than an additional twelve families with similar claims that have not yet been filed. Of the cases filed, the nine suits seek more than $20 million in compensatory damages and almost $3 million in punitive damages. Judgments in all of these cases will certainly affect the finances of Mid–Atlantic and the amount of funds the Navy ultimately receives from the Operating Reserve Account for its sole benefit. Therefore, this lawsuit and the others pending do involve significant federal interests.

Finally, although both parties have addressed the fact that the Navy still owns the homes even after conveying them, it is important to note in this context that Mid–Atlantic cannot sell these homes, and the homes, and all improvements, revert back to the Navy. There has been no deed actually giving title to the real estate to Mid–Atlantic. Mid–Atlantic has a limited grant from the Navy, and the homes and land are not taxable by the City of Norfolk as they belong to the federal government. *See* http://gisapp2.norfolk.gov/parcelinfoapp/parcels/ (showing that no land parcel information exists for this property, 1138 Kings Lynn Drive, in the City of Norfolk database). In addition, property law is involved. The harm alleged is part of the realty, i.e., mold on the structures. Questions of faulty design, manufacture, maintenance, and repairs will have to be addressed, and the Navy not only built the homes but has also played a role in the upkeep and repair of the homes over many years and transferred them with or without mold for a limited period of time with strict oversight by the Navy.

▪ In conclusion, this entire analysis covering many pages demonstrates the nature and extent of the substantial federal interests involved in this case. The Navy will be grossly affected by this case and the many others that Plaintiffs' counsel seeks to pursue. Therefore, the Court holds that where concurrent jurisdiction over claims arising on a federal enclave exists, and matters involve substantial federal interests such that a federal question is presented, federal jurisdiction over the state law claims is proper.

## V. Conclusion

For the reasons set forth above, this Court finds that the correct analysis for a federal district court to undertake in determining whether or not it has jurisdiction over civil claims arising on a federal enclave is to first to determine that the claims alleged occurred on a federal enclave. The Court should next determine whether the United States has exclusive or concurrent jurisdiction over the enclave. If the United States exercises concurrent jurisdiction, the court should determine what reservations the United States or state made with regard to its jurisdiction in ceding jurisdiction. Thus, for this question, the fact that the Navy had exclusive jurisdiction and then ceded concurrent jurisdiction to the Commonwealth of Virginia is of great importance. Prior to the Navy ceding part of its jurisdiction, the Commonwealth's laws became federal laws. If concurrent jurisdiction over civil causes of action exists, the district court should determine whether it is important to have a federal forum in which to litigate the controversy arising on federal enclaves in or-

der to prevent state judicial interference with matters likely to involve substantial federal interests. Indeed, the Court finds that issue of the state court's concurrent jurisdiction is irrelevant to the issue of whether a federal question is presented. If after examining the nature of the complaint, the legal issues, and the parties involved, the case implicates substantial federal interests, then there is a compelling argument for holding that federal enclave jurisdiction exists over the claims.

Under that analysis in this case, the Court finds—and the parties do not dispute—that the claims alleged occurred on Norwich Manor, which is land on a federal enclave over which the United States had exclusive jurisdiction when it acquired it through a condemnation action February 12, 1942. At that time, the Court finds that the law of the Commonwealth of Virginia remained in effect only as federal law over the land that is now Norwich Manor. Subsequently, on September 18, 1984, the United States Navy relinquished its exclusive jurisdiction over Norwich Manor to a concurrent legislative jurisdiction with Virginia. Therefore, the Court finds that when the events alleged in the Complaint occurred, Norwich Manor was under either exclusive federal jurisdiction or the concurrent legislative jurisdiction of the United States and the Commonwealth of Virginia since the mold and damp indoor space conditions may have developed prior to, or were present when, jurisdiction was partially ceded back to the Commonwealth. The Court has analyzed the nature of the complaint, the legal issues, and the parties in detail and finds that this case implicates substantial federal interests. As discussed in great detail above, one Plaintiff is an active duty service member. Congress passed the military housing privatization initiative involved that led to the creation of the public-private venture, Mid–Atlantic, and which includes continued reporting requirements. Plaintiffs allege that this initiative created bad incentives. The Navy is heavily involved in the operation of Mid–Atlantic, the Navy owns the land and home in question where the events alleged in the Complaint occurred, the Navy provides and refers the tenants, the Navy has a substantial financial interest in the operation of Mid–Atlantic, and a judgment in this case and the other suits that have been filed or will be filed will impact financial interests of the Navy. Since this case involves substantial federal interests, the Court finds that the concurrent jurisdiction the United States holds over this federal enclave gives the Court federal question jurisdiction to hear this case. Although a state court would also have jurisdiction over this case, the Court finds that a federal forum is most appropriate given the substantial federal interests involved to fully and fairly adjudicate the claims raised in the Complaint. The Court has no doubts as to the propriety of removal in this case and finds that Defendants have borne their burden of establishing federal jurisdiction.

Therefore, the Court hereby **DENIES** Plaintiffs' Motion to Remand. The Clerk is **ORDERED** to file this Opinion and Order temporarily **UNDER SEAL** until 12:00 p.m. on Friday, October 5, 2012 unless further ordered by the Court The Court will publish this Opinion and Order, and Defendants have until 12:00 p.m. on Friday, October 5, 2012, to advise the Court of any portions of this Opinion and Order they feel the Court should redact prior to publishing it The Clerk is **DIRECTED** to deliver a copy of this Opinion and Order to all Counsel of Record in this case.

**IT IS SO ORDERED.**